(Decided 8th March, 1878.)

---

THE FIRST NATIONAL BANK OF WASHINGTON CITY, WILLIAM B. WEBB, Trustee, and EDWIN L. STANTON, Receiver *vs.* MARTHA A. ECCLESTON.

*Power of a Court of Equity to vacate a Decree to let in a Meritorious defence—This may be done upon Petition—Insufficient ground for Denying an application to have a Decree vacated—Competency of a Wife, after the death of her Husband, to Testify on her own offer, that her Signature to a Deed was procured by his Fraud and violence—Act of 1864, ch. 109, sec. 2.*

On a bill filed against husband and wife, who were non-residents, for the sale of real estate under a deed of trust or mortgage, a decree was passed *pro confesso* on the 11th of October, 1872, after an order of publication, for the sale of the land, unless the defendants should pay the debt, interest and costs, on or before the 12th November, 1873, or bring the money into Court to be paid to the complainants. The decree not being executed, the wife on the 26th November, 1874, and after the death of her husband, filed her petition in the cause, praying that the enrolment of the decree might be vacated, and

First Nat'l Bank of Washington, *et al. vs.* Eccleston.

she be allowed to answer the bill, for the reasons (among others) that the deed was void as against her, because she was forced to sign and acknowledge it by the threats, menaces and ill-treatment of her husband, which she, in her then enfeebled condition of health, was unable to resist; and that the existence of the suit in which the decree was passed, was studiously concealed from her by the devices of her husband. Upon this application, and after the petition had been answered by the receiver of the Bank, who had been admitted as a party complainant, and by the trustee in the deed, and after proof taken, the Court vacated the decree, and afterwards on final hearing dismissed the bill. On appeal, it was HELD:

1st. That where a decree has been passed by default, without a hearing upon the merits, a Court of Equity has power, in the exercise of a sound discretion, to vacate the enrolment in order to let in a meritorious defence, and this may be done upon petition, without a bill of review or an original bill for fraud.

2nd. That the application could not be denied, because the petitioner had not filed her petition within "two months" after she had knowledge of the decree, in analogy to the 9th Rule respecting Appeals, for though it is true that in some cases Courts of Equity have adopted by analogy statutory limitations of time with respect to the assertion of certain rights, and particularly the right of appeal after the discovery of fraud or mistake, where the statute is silent as to the time within which appeals in such cases may be taken, yet no case has decided that it is absolutely imperative upon the Courts to adopt such limitations in every case, and with respect to every right. On the contrary, so far as the decisions have gone, it is plain no such inflexible rule exists with reference to a case like the present.

3rd. That the power of the Court to open the enrolment is a discretionary power to be exercised, or not, according to the circumstances of the case, and this is applicable as well to the time when the petition is to be filed, as in other respects.

The wife having under the commission testified on her own offer and in her own behalf, it was objected that she was not a competent witness after the death of her husband, to testify that her signature to the deed was procured by his fraud and violence. HELD:

That the witness was competent; that such evidence was not excluded by the provision in the Evidence Act (1864, ch. 109, sec. 2,) that "when an original party to a contract or cause of action is dead, either party may be called as a witness by his opponent, but shall not be admitted to testify on his own offer."

APPEAL from the Circuit Court for Montgomery County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., STEWART, BRENT, MILLER, ALVEY and ROBINSON, J.

*T. W. Bartley* and *A. Stirling, Jr.*, for the appellants.

The Court ought to have granted the appellants' motion to dismiss the petition of the appellee, and certainly ought not to have required the appellants to answer.

The petition was filed too late. It is not sufficient to justify the interposition of a Court of equity that the party seeking relief *once* had a case, if it also appear that the party lost the opportunity through negligence. *Miller vs. Bernecker,* 46 *Missouri,* 194.

Twelve months are given by the Code, from the date of the decree, for review in cases of specific performance, &c., but the Code *expressly* negatives the idea that a non-resident defendant shall have a day in Court for review of any decree *to foreclose a mortgage, or for sale of mortgaged premises, or a decree for the sale of real property to pay debts or liens, &c.* 1 *Code, Art.* 16, sec. 91.

The cases of *Herbert vs. Rowles,* 30 *Md.,* 278, *Burch vs. Scott,* 1 *G. & J.,* 423, and *Oliver vs. Palmer and Hamilton,* 11 *G. & J.,* 142, were not decrees of foreclosure of mortgages or for sale of mortgaged premises, or for sale of real property to pay debts or liens, &c.

The petition being in the nature of a bill of review, was filed more than nine months after the passage of the decree, without alleging the discovery of any facts not known to the petitioner at the date of said decree, or which might not have been known by the use of reasonable diligence. *White, Trustee vs. Bowie, et al., Liber G. E. & J. S. F., No.* 1, *folio* 370, of "*Opinions Unreported;*" *Hitch vs.*

*Fenby*, 4 *Md. Ch. Dec.*, 191; *Story's Eq. Pl.*, 377, *sec.* 414; *Pfeltz vs. Pfeltz*, 1 *Md. Ch. Dec.*, 455; *Berrett vs. Oliver*, 7 *G. & J.*, 191–207.

The petition is in the nature of a bill of review—bills of review filed upon the ground of fraud, surprise or mistake, being analogous to the right of appeal for the same cause, must be within *two months from the discovery* of the fraud or mistake. *Pfeltz vs. Pfeltz*, 1 *Md. Ch. Dec.*, 456; *Rule of Court of Appeals, No.* 9, 29 *Md.*

The decree has been enrolled and the jurisdiction of the Court has ceased, and the decree cannot be inquired into except by a bill of review. *Pfeltz vs. Pfeltz*, 1 *Md. Ch. Dec.*, 455; 1 *Code, Art.* 16, *sec.* 91; *Burch, et al. vs. Scott*, 1 *G. & J.*, 393.

The fact that there was no actual service of process on the appellee does not make her's an exceptional case in regard to the time when she should have filed her petition. An order of publication duly published performs the same office and has the same legal effect as process actually served. 1 *Code, Art.* 16, *secs.* 88–98; *Dorsey vs. Thompson, et al.*, 37 *Md.*, 44; *Johnson, &c. vs. Robertson*, 31 *Md.*, 490.

The allegations of the bill which by the effect of the order of publication were confessed and admitted to be true, by the failure of the appellee to appear on the day limited by said order and answer, authorize the Court to decree the relief in the manner they did. 1 *Code, Art.* 16, *secs.* 88, 122; *Alex's Ch. Pr.*, 336–39–51; *Fitzhugh vs. McPherson*, 3 *Gill*, 429; *Masterden vs. Howard*, 18 *Wallace*, 99; 1 *Greenleaf's Ev.*, 24; *Luckett vs. White*, 10 *G. & J.*, 480; *Gibbs vs. Clagett*, 2 *G. & J.*, 14; *Robinson vs. Townshend*, 3 *G. & J.*, 413; *Strike vs. McDonald*, 2 *H. & G.*, 222.

Where the matters and things charged in the petition as constituting the fraud, are facts connected with the execution of the instrument, known to the petitioner at the

time of the passage of the decree by the legal operation of the order of publication, or which, by the use of due diligence, she might have known, they form no ground for the relief sought. *Act of* 1868, *ch.* 435; *Burch vs. Scott,* 1 *G. & J.,* 423; *Hitch vs. Fenby,* 4 *Md. Ch. Dec.,* 190; *Dorsey vs. Dorsey,* 30 *Md.,* 527; *Herbert vs. Rowles,* 30 *Md.,* 278; *Thruston vs. Devecmon,* 30 *Md.,* 217; *White, Trustee vs. Bowie, et al., Liber* "*G. E. & J. S. F.,*" *No.* 1, *folio* 370, *of* "*Opinions Unreported;*" *Story's Eqty. Pl.,* 377, *secs.* 414, 423; *Fitzhugh vs. McPherson,* 3 *Gill,* 429; *Pfeltz vs. Pfeltz,* 1 *Md. Ch. Dec.,* 455; *Hollingsworth vs. McDonald,* 2 *H. & J.,* 237; *Pinkney vs. Jay,* 12 *G. & J.,* 69; *Luckett vs. White,* 10 *G. & J.,* 480; *Lingan vs. Henderson,* 1 *Bl.,* 264; *Ridgeway vs. Toram,* 2 *Md. Ch. Dec.,* 303; *Johnson, &c. vs. Robertson,* 31 *Md.,* 477.

As to the regularity of the decree *pro confesso,* see *Alex. Chan. Pr.,* 51–52, 336 *and* 337; also 1 *Code, Art.* 16, *secs.* 88 and 122.

It makes no difference that the appellee was a *féme covert* at the time of passing the original decree.

The interests of a *féme covert* are carefully protected by a Court of equity, but she has not the privilege of having the proceedings suspended, or having a day to show cause after she should become *sole,* as an infant has, for if the plaintiff establish his case, he has the right to an absolute decree against her and her estate. *Watkins vs. Worthington,* 2 *Bl.,* 509 and 520.

Even if the appellee filed her petition in time, the decree ought not to have been vacated, because it was authorized by the allegations of the bill and the exhibit filed therewith; for although the deed of trust be defective as to its acknowledgment, yet it constitutes an equitable lien on the property it embraces, and there was no error in the decree enforcing its payment. *Hall & Hume vs. Eccleston, et al.,* 37 *Md.,* 518–522; 1 *Code, Art.* 16, *sec.* 134; *Brundige vs. Poor,* 2 *G. & J.,* 1; *Helms vs.*

*Franciscus,* 2 *Bl.,* 544; *Nusz, et al. vs. Grove,* 27 *Md.,* 391; *Cook vs. Husbands,* 11 *Md.,* 492; *Michael vs. Baker,* 12 *Md.,* 158; *Chew's Adm'r vs. Beall,* 13 *Md.,* 348; *Buchanan vs. Turner,* 26 *Md.,* 5; *Burton, et al. vs. Marshall,* 4 *Gill,* 487; *Norris vs. Lantz & Hyde,* 18 *Md.,* 269.

*James B. Henderson* and *Alex. B. Hagner,* for the appellee.

It is objected by the appellants that the bill or petition was *not filed in* time, because it should have been filed within two months after the existence of the suit and decree became known to the appellee, the appellants contending that under rule nine, of the new rules of the Court of Appeals, appeals are required to be taken within two months after the discovery of the fraud or mistake, and the appellee's application to vacate the decree is to be considered as a bill of review and must follow the analogy.

This proposition the appellee cannot concede. While this Court has in several instances decided that bills of review, technically such, must follow the analogy of appeals and be filed within nine months from the date of the decree, because decrees are required to be taken within that period of time, it has never been decided that a bill of review, alleging that the decree or order sought to be reviewed was obtained by fraud or mistake, must be filed within two months from the time of the discovery of the fraud or mistake. Until the rule referred to was adopted there was no limitation to the time within which appeals should be taken, after the discovery of the alleged fraud or mistake, and this limitation was intended to discourage appeals, when the same object could be accomplished by a bill of review, a petition in the nature of a bill of review, or an original bill for fraud, and it was not intended that the same limitation of time should be applied to bills of review or petitions in their nature. The question is whether in view of all the circumstances of the case, there

has been such unreasonable delay in filing the petition, that the appellee is to be considered barred from prosecuting her proceeding to vacate the decree by her own *laches*. We think not. It will be observed from the testimony, that when the appellee first became aware of the existence of the decree, to wit, about the middle of April, 1874, she was laboring under the disability of coverture.

It was not until the last of May, 1874, that she received notice of her husband's death. Her petition was filed in December of 1874, a period of less than seven months. In the meantime the situation of the case and the parties thereto remained unchanged. No sale had been made by the trustees. The rights of no third peson had intervened.

The appellants in December, as they had in the preceding April, rested upon their decree. The appellee was a widow with a family of helpless children, deprived of the services of her regular counsel, who were employed on the other side, and without means to employ counsel, as she possessed nothing but the property in dispute, and unable to make that productive so as to raise funds with which to prosecute her suit. In view of those circumstances, was the delay complained of unreasonable?

This application is analogous to the motion to strike out a judgment at law, and the Court would grant such motion upon such a state of case at law. *Tiernan vs. Hammond,* 41 *Md.*, 548.

Again, the petition not only seeks to vacate the decree for error apparent on its face, and because it was obtained by fraud, but presents meritorious grounds of defence to an action not heard upon its merits, the bill having been taken *pro confesso,* and a decree entered by default without the production of any evidence. This case therefore, is not within the rule relied upon by the appellants. Should such rule be considered applicable to bills of review or petitions in their nature, in cases which had been heard upon their merits? The distinction between the cases is

very clearly drawn in the cases of *Oliver vs. Palmer and Hamilton*, 11 *G. & J.*, 141, and *Herbert vs. Rowles*, 30 *Md.*, 271.

These authorities clearly establish the power of a Court of Equity to set aside a decree after the period of time prescribed by law for an appeal has expired, in cases properly invoking the exercise of that sound discretion the Court is conceded to possess upon such subjects.

It is submitted that the petition of the appellee presents such a case.

Assuming then that the appellee's petition was filed in time, the next question that presents itself is, had the appellee notice of the pendency of said suit and the existence of the decree, before the time stated in her petition, and testimony, viz., the middle or latter part of April, 1874? And in this inquiry is involved the allegation that her husband concealed such knowledge from her. She swears in the most positive and unequivocal manner that she had not, and she is supported by all the facts, circumstances and probabilities of the case.

The appellee is a competent witness. Act of 1864, ch. 109, sec. 1. She is not within the exception in sec. two, of said Act. The contract or cause of action was not between Eccleston and the appellee, but between the bank on one side and Eccleston and his wife on the other. Eccleston was in no sense the original party to the contract or cause of action, as opposed to his wife, within the contemplation of the section of the Act referred to. The appellee testifies to the acts and declarations of Eccleston, acting as agent of the bank, which was the other party to the contract.

The next and last question to be considered is: Was the appellee, when she executed the paper in question, a free and voluntary agent, or was she induced to execute it by such undue pressure as to deprive her of her volition? If the latter be the case, the deed is void, and cannot be

enforced against her.    *Davis vs. Calvert*, 5 *G  & J.*, 269 ; *Central Bank of Frederick vs. Copeland and Wife*, 18 *Md.*, 305 ; *Comegys, &c. vs. Clarke, et al.*, 44 *Md.*, 110 ; *Whitridge vs. Barry*, 42 *Md.*, 140; *Wittman, &c. vs. Goodhand, &c.*, 26 *Md.*, 105 ; *Drury vs. Foster*, 2 *Wallace*, 24.

Proof of a criminal act committed by the wife *in the presence of the husband*, will not support a conviction, the conclusion being that she acted *under coercion.*    1 *Taylor's Ev.*, sec. 152.

The debt, the payment of which the deed of trust was to secure, was not the appellee's debt, but the debt of her husband, contracted for purposes from which she derived no benefit, and a contract to give security for the debt of another, which is a contract without consideration, is above all things a contract which should be based upon the free and voluntary agency of the individual who enters into it.    *Williams, et al vs. Bayley*, 35 *Law Journal*, 717.

MILLER, J., delivered the opinion of the Court.

The record in this case shows that on the 2nd of June, 1868, Charles A. Eccleston and Martha A. Eccleston his wife, executed a deed of trust of certain real estate in Montgomery County, to secure a debt of $15,000 due by the husband to the First National Bank of Washington. The land so conveyed or mortgaged belonged to the wife, who had acquired the same by conveyances from her father and other parties.    In 1871, a bill was filed in the Circuit Court for Montgomery County, by the bank and the trustee in the deed, against Eccleston and wife who were then non-residents of this State, living in the city of Brooklyn, State of New York, for a sale of the property to pay this debt.    The usual order of publication was duly published, and the Court on the 11th of October, 1872, passed a decree taking the bill *pro confesso* against the defendants and ordering the land to be sold unless they should, on or

before the 12th of November, 1873, pay the money or bring it into Court to be paid to the complainants.

On the 26th of December, 1874, Mrs. Eccleston filed her petition praying that the enrolment of the decree might be vacated and she be allowed to answer the bill. The grounds important to be noticed (though others are alleged) upon which the petition asks this relief are, 1st, that the deed is void as against her, because she was forced to sign and acknowledge it by the threats, menaces and ill-treatment of her husband, which in her then weak and enfeebled condition of health, she was unable to resist. 2nd, that she had no knowledge of the institution or pendency of this suit, or of the proceedings therein; that its existence was studiously concealed from her by the fraudulent devices of her husband, and she remained in total ignorance thereof until about the middle of April, 1874. The receiver of the bank who on petition had been admitted a party complainant in the cause, and the trustee in the deed being required to answer this petition, did so, denying all its material allegations, and insisting that even if they were true, they do not under the circumstances of this case, authorize the Court to discharge the enrolment and set aside the decree. On this petition and answer, testimony was taken on both sides, and the Court, on the 7th of December, 1876, passed an order vacating the decree and allowing the petitioner to answer the bill upon the condition, among others, that at any future hearing of the cause, she shall rely only on the defence that her execution and acknowledgment of the deed were procured by fraud, duress, or other improper influences, and that she was prevented from receiving notice of the order of publication by the same means. She then filed her answer to the bill reiterating the averments of her petition, with respect to the circumstances under which she executed and acknowledged the deed of trust. After replication to this answer and further testi-

mony, the Court, on final hearing, passed a decree dismissing the bill, and from this as well as from the order vacating the original decree, the complainants have appealed.

Where a decree has been passed by default without a hearing upon the merits, a Court of equity has power in the exercise of a sound discretion, to vacate the enrolment in order to let in a meritorious defence, and this may be done upon *petition* without a bill of review or an original bill for fraud.   This doctrine was fully considered and settled by the case of *Herbert vs. Rowles*, 30 *Md.*, 271, and was not controverted by the appellants' counsel in argument, but they have argued and contended,

1st. That though the decree which was opened in this case appears on its face to be a decree by default, yet it is shown by the proof to have been entered by consent.   But in our judgment the proof does not sustain this position to the extent of making it a decree by consent as against Mrs. Eccleston.   All that the testimoney on this point shows is that Mr. Henderson of the law firm of Peter & Henderson, about the date of the decree received a letter from Eccleston, the husband, calling his attention to this case, and saying he intended to make no defence, but wanted a stay of execution for twelve months; that immediately upon receipt of this letter he went to the office of Messrs. Anderson & Bouic, the solicitors of the complainants, informed them of the contents of the letter, and they agreed to grant the requested stay, and effected it by changing the date in the decree at which the money was to be brought in from the 12th of November, 1872, to the 12th of November, 1873, and the decree so changed as to date, was then filed, but Mr. Henderson positively swears he was never authorized by Mrs. Eccleston, either in person or by letter to appear for her in the case.   Clearly this intervention of counsel at the instance of the husband cannot bind the wife, nor make this a decree by consent as against her.

2nd. But it is further argued that the petition was too late, and should have been filed within two months after the petitioner had knowledge of the decree. The law provides that when a party makes oath that a decree was obtained by fraud or mistake, he may appeal after nine months, but requires in such cases that "the appeal shall be entered within two months from the time of the discovery of the fraud or mistake, and not afterwards;" (*Rule* 9, *respecting Appeals,* 29 *Md.,* 4,) and it is insisted this limitation must by analogy be applied to the filing of this petition. It is true that in some cases Courts of equity have adopted by analogy statutory limitations of time, with respect to the assertion of certain rights, and particularly the right of appeal after discovery of fraud or mistake, where the statute is silent as to the time within which appeals in such cases may be taken, (*Oliver vs. Palmer & Hamilton,* 11 *G. & J.,* 137,) but no case has decided that it is absolutely imperative upon the Courts to adopt such limitations in every case, and with respect to every right. On the contrary, so far as the decisions have gone, it is plain no such inflexible rule exists with reference to a case like the present. In *Herbert vs. Rowles,* the decree was passed in July, 1865, and the petition to vacate its enrolment was not filed until April, 1866, and the pendency of the proceeding was known to the petitioner's counsel who was allowed to appear for him before the decree was passed, and yet it is plain from the opinion in that case, that this lapse of time would not have been considered a bar to the relief if the petition in connection with other facts disclosed by the record, had afforded sufficient ground for the exercise of the discretion invoked. We there adopted what was said by Lord HARDWICKE in *Kemp vs. Squire,* 1 *Ves. Sen.,* 205, that the power of the Court to open the enrolment is a discretionary power to be exercised or not *according to the circumstances of the case,* as being applicable, as well to the time when the petition

is to be filed as in other respects. Here the petitioner did not know of the decree until the middle of April, 1874, and she filed her petition on the 26th of December, of the same year. When she was informed of the decree, she was a married woman. Her husband sailed for England, of which country he was a native, on the 24th of March, 1874, and died there on the 28th of April, following, but she did not receive satisfactory information of his death until the latter part of May. She was then a widow with infant children, and if she did not at once disclose her grievances, consult counsel and become advised of her rights, the delay, if not unreasonable, ought not, of itself, to prevent her from obtaining the relief to which she would otherwise be entitled. In the interval after knowledge and before acting, no change of interest in the mortgaged property had taken place. No third party had acquired any right to it, but it stood precisely as it did in the preceding April, and, in our opinion the circumstances of the case, are not such as to justify a Court of equity in holding this lapse of time an absolute bar to the relief prayed by the petition.

3rd. It is next contended that Mrs. Eccleston is not a competent witness to sustain the allegations of her petition, and this objection is founded on the clause of the Evidence Act, that " when an original party to a *contract* or *cause of action* is dead, either party may be called as a witness by his opponent, but shall not be admitted to testify on his own offer." It is insisted that after the husband's death, the wife ought not to be allowed to testify that her signature to the deed was procured by his fraud and violence, and that, as the question is presented by her petition, she is within the spirit if not the letter of the above provision. This clause creates an exception to the general provisions of the Act which remove the incompetency of witnesses on the ground of interest, and allow parties to suits to testify, and it has frequently been con-

sidered by this Court, the last instance being in the case of *Graves, et al. vs Spedden, et al.*, 46 *Md.*, 527. In that case, in the course of proceedings for the partition and settlement of an estate, a question arose between the heirs at law, whether a deed of part of the land made by the deceased father to his sons, was an advancement or an absolute gift, and that depended upon the intention of the father when he executed the deed. One of the sons and one of the grantees in the deed was offered as a witness, to prove in his own behalf, and as against his co-heirs, declarations of the father made to him at or about the time the deed was executed, showing that the grantor intended it as an absolute gift, and this clause of the statute was relied on as excluding him; but we held, he was a competent witness to prove such declarations. That is a much stronger case against the competency of the witness than the present. Here the parties to the deed, are the husband and wife on the one side, and the trustee of the bank on the other; and both husband and wife are made defendants to the bill filed by the bank, and the trustee to enforce the trust. The husband dies, and the wife now testifies, as against the living complainants, the other parties to the deed and to the suit, to acts committed by the husband in his life-time, which make the deed void as to her. But these acts thus testified to, constituted no ground or cause of any civil action, (except for a divorce,) by the wife against the husband when living, and certainly furnish none against his personal representatives. It is conceded that if he were living, the wife could set up this defence to the deed, and give this testimony. In what worse position are the complainants placed by his death? Simply in that of having lost the testimony of a witness who knew the facts, and might have been called by them to contradict, if he could, her testimony. But however much this circumstance may weigh against her credibility, it in no wise affects her competency as a witness.

This brings us to the main inquiry in the case. Was the execution of this deed by Mrs. Eccleston procured in the mode and by the means stated in her petition? In determining this question, which depends entirely upon the testimony in the record, we have considered, and felt the full force of the very zealous and earnest arguments of the appellants' counsel, and have given due weight to every point they have pressed upon our attention. As weighing against the credibility of Mrs. Eccleston, the chief witness, we have considered her silence during the life of her husband, the delay in filing her petition after his death and after she had knowledge of the decree, the discrepancies wherever 'they exist between her testimony and that of other witnesses, and above all, the fact that she is testifying in her own interest, to save not only her property, but herself and infant children from want and poverty, and yet we have not been able to bring our minds to the conclusion that she has committed perjury. In its main and substantial features, her testimony is corroborated by that of her sister, Mrs. Jones, who was then unmarried and living in the house with her, and we must either reject the statements of both these witnesses as altogether false and wilfully fabricated or accept them as true. Their testimony is so positive, direct and circumstantial as to leave us no other alternative. It cannot upon any theory of mistake, or confusion of dates, or application of facts that may have occurred at some other time to the occasion in question, be reconciled with truthfulness and integrity. Accepting then, as in our judgment we must, this testimony as worthy of credit, it presents circumstances stronger than those in *Central Bank vs. Copeland and Wife*, 18 *Md.*, 305, or in *Whitridge vs. Barry*, 42 *Md.*, 140, or in any other case of like character contained in the judicial records of this State. We do not propose to state in detail the language, acts and conduct of the husband, manifesting and proving the alleged duress.

It is sufficient to say in brief, that it is shown by the proof that in the latter part of May, 1868, after this deed had been prepared, the husband took it to his wife and demanded she should sign it without knowing its contents, telling her it was but a matter of form ; that she was then near her confinement, in that condition of health and anxiety which required kindness and sympathy; that upon her expressing an unwillingness to sign without some knowledge of what the paper was, he enforced his demand from time to time with curses and oaths, and threats of personal violence, and even of her life, until by these means and the general violence and harshness of his conduct and temper towards her and in her presence, he overpowered her will and resistance ; and that he then took her to the City of Washington, where she signed and acknowledged the deed before a notary public without knowing what it contained.   The appellants' counsel have not only conceded that this makes out a case of duress, but have argued that in view of what is proved to have been the antecedent and subsequent conduct of the husband in the kind treatment of his wife, this outburst of passion was so sudden, and violent and cruel as to make the story altogether improbable, and that this of itself, is sufficient to discredit the witnesses who have told it.   But it must be remembered that at this time the husband was in the last stage of financial embarrassment, and that the bank required this deed as a condition of further indulgence for what he already owed, and of further assistance by a further loan.   He wanted money immediately to uphold his credit and avert financial ruin, and with this strong pressure upon him, his resort to these extreme measures to obtain his wife's signature to the deed which was to relieve and save him, when he found her unwilling to yield to his wishes, does not seem to us so improbable as counsel have supposed.   Moreover, the fact that he had been kind and affectionate to her before, and that after she yielded to his

demands his habitual kindness and affection for her re-
turned, furnishes, we think, a natural and reasonable
explanation of her subsequent silence on the subject, and
of the circumstance that she did not disclose his conduct
to her father or brothers, or other relatives, when they
visited her in Brooklyn, or when she visited them in the
summer of 1871. Besides this, she herself gives a further
and quite natural explanation of this silence, in that
part of her testimony in which she says that in October
following the execution of the deed, her husband told her
the debt was settled and she would hear nothing further
from it. This was a statement well calculated to quiet her
apprehensions, and to prevent inquiry and complaint.
Nor do we attach much importance to the fact that none of
the household servants, or tenants or workmen on the
farm have been examined by the petitioner, or that those
of them who have been called on the other side, have
sworn they had no knowledge of such conduct of the hus-
band. It is obvious that if this treatment of his wife had
been displayed in their presence, it would have endangered,
if not prevented the accomplishment of his purpose, while
the wife on her part, had the strong motive of womanly
pride, as well as wifely affection and delicacy, to conceal
such conduct of her husband from such parties. In the
testimony of Dr. Taylor as to whether he saw Mrs. Eccles-
ton on the occasion of which she speaks, we find no such
clear and positive contradiction of her testimony as would
justify us in saying she has sworn falsely as to this inci-
dent. Substantially the same thing may be said of the
testimony of Mrs. Reynolds. It is by no means certain
that in the conversation she testifies she had with Mrs.
Eccleston, the latter referred to this *particular deed* and
the circumstances attending her acknowledgment of it.
The record shows that she had united with her husband in
the execution and acknowledgment of many other deeds.
There is more difficulty in dealing with the testimony of

Charles C. Callan, the son of the deceased notary before whom the deed was executed and acknowledged. Mrs. Eccleston swears she signed the deed in the carriage in front of the notary's office, while this witness swears she went into the office and signed it there It is of course of no consequence whether this act was done in the one place or the other. The contradiction is only important as affecting in the mind of the tribunal to pass upon it, the credibility of Mrs. Eccleston, and on this point it presents the case of witness against witness. Interest in the result of the suit weighs against one, while the absence of such interest is in favor of the other. But tending to her corroboration is the undoubted condition of her health, rendering it probable she would not have left the carriage unless there was urgent necessity of so doing, and as pointing at least in the same direction, is the appearance of the instrument itself in the alterations made in the form of the acknowledgment. This had been prepared for a magistrate of Montgomery County, and had to be changed to suit it for a Notary Public in the City of Washington. This change was so hastily or carelessly made as to leave it stating what was in fact not true, viz., that it was taken before a Notary Public in and for Montgomery County, State of Maryland. It is difficult to suppose that if the parties were in his office, where the act could be deliberately done, an experienced Notary would have made this mistake and left the certificate of acknowledgment in this shape. This circumstance indicates something unusual in the transaction, and is entirely consistent with the supposition, that the husband having compelled the assent of his wife to sign the deed, went into the office and represented to the Notary whom he knew, (and before whom, he and his wife had executed at least one other similar instrument,) the delicate condition of his wife's health, and the consequent propriety of her not leaving the carriage, and the necessity of haste in the transaction, signed the deed

there himself, and that it was then immediately taken to the wife in the carriage for her signature, after the alterations in the form of the acknowledgment had been hastily made by the Notary. In view of these considerations, and even assuming the testimony of M. P. Callan, the other witness to the deed, refers to this particular instrument (though on cross-examination he says he cannot so swear,) and not to another deed by the same parties, which he also witnessed, we cannot declare that this testimony is sufficient to discredit Mrs. Eccleston as to the scenes which took place at the house, corroborated, as she unquestionably is in this respect, by the testimony of her sister.

Having given to the case a very careful consideration, and having reached these conclusions both on the questions of law and of fact, the result is that the order and decree appealed from must be affirmed.

*Order and decree affirmed.*

(Decided 8th March, 1878.)

ALVEY and ROBINSON, J., dissented, and the former delivered the following opinion:

With my convictions in regard to the merits of this case, I cannot do otherwise than dissent from the opinion of the majority of the Court, affirming the decree of the Court below.

This case, like many others of recent occurrence of a kindred character, is sought to be brought within the principle of the case of *The Central Bank of Frederick vs. Copeland,* 18 *Md.,* 305; but I think the requirements of the present case carry the principle of the supposed precedent to a most dangerous extent.

In the first place, I think it clear that the appellee is not a competent witness. Apart from the matter of interest, she would not be a competent witness at the common law, upon principles of public policy. The evidence Act of 1864, ch. 109, sec. 1, only removed the previous incom-

petency by reason, 1st, of interest in the subject-matter, and, 2nd, of previous conviction for crime. But by the 2nd section of the Act, as re-enacted by the Act of 1876, ch. 222, "*when an original party to a contract or cause of action is dead*, or shown to be lunatic or insane, or when an executor or administrator is a party to the suit or other proceeding, either party may be called as a witness by his opponent, but shall not be admitted to testify on his own offer, or upon the call of his co-plaintiff or co-defendant otherwise than now by law allowed, unless a nominal party merely." Here, the husband, the party with whom and for whom the wife is said to have contracted, is dead. The whole subject of controversy in this case is in regard to the contract between the husband and wife, whereby the latter was induced by the alleged persuasions, and threatening conduct, of the husband, to pledge and convey her property for the security of his debt; and there is no pretence that she was influenced by any other person; and if the husband were living, it is clear, he would be a necessary party to these proceedings. It would, therefore, seem to be plainly a case of exclusion within the terms of the statute.

But, apart from all question of interest, is she not incompetent for a reason not touched by the statute?

In the English statute of 16 and 17 Vict., c. 83, sec. 3, it is expressly provided that " No husband shall be compellable to disclose any communication made to him by his wife during the marriage, and no wife shall be compellable to disclose any communication made to her by her husband during the marriage." This wise provision of the statute, says Mr. Taylor, (1 *Taylor's Ev.*, *p.* 810,) "rests on the obvious ground, that the admission of such testimony would have a powerful tendency to disturb the peace of families, to promote domestic broils, and to weaken, if not to destroy, that feeling of mutual confidence, which is the most endearing solace of married life. The protection

is not confined to cases where the communication sought to be given in evidence is of a *strictly confidential* character, but the seal of the law is placed upon *all communications of whatever nature which pass between husband and wife.* It extends also to cases in which the interests of strangers are solely involved, as well as to those in which the husband or wife is a party on the record." See *O'Connor vs. Marjoribanks*, 4 *M. & Gr.*, 435. And Mr. Greenleaf, in his work on Evidence, vol. 1, sec. 254, is equally explicit in stating the rule of exclusion of all communications between husband and wife. He says that the rule obtains independently of the ground of interest and identity, which precludes the parties from testifying for or against each other. The happiness of the married state, says this author, "requires that there should be the most unlimited confidence between husband and wife; and this confidence the law secures, by providing that it shall be kept for ever inviolable; that nothing shall be extracted from the bosom of the wife, which was confided there by the husband. Therefore, after the parties are separated, whether it be by divorce or by the death of the husband, the wife *is still precluded from disclosing any communication with him.*"

The rule itself, with the reasons upon which it is founded, will be found well and clearly stated by the Supreme Court in *Stein vs. Bowman*, 13 *Pet.*, 222, 223. In that case, the wife, having no interest in the suit, gave evidence to impeach the credit of her deceased husband; to prove in fact that he had committed perjury; but it was held to be wholly improper to admit such evidence; and the Court said: "It is true the husband was dead, but this does not weaken the principle. Indeed, it would seem rather to increase than lessen the force of the rule. Can the wife, under such circumstances, either voluntarily be permitted, or by force of authority be compelled, to state facts in evidence which render infamous the character of her

husband? We think, most clearly, that she cannot be. Public policy and established principles forbid it."

By the Act of Congress, U. S., of the 2nd of July, 1864, it is provided that there shall be no exclusion of any witness in civil actions because he is a party to or interested in the issue to be tried—a statute more sweeping and unqualified, as to the former disqualification by reason of interest, than our own. And yet, the Supreme Court, in the case of *Lucas vs. Brooks*, 18 *Wall.*, 436, 453, held, without a dissent, that the wife was not a competent witness for the husband. The Court said: "Undoubtedly the Act of Congress has cut up by the roots all objections to the competency of a witness on account of interest. But the objection to a wife's testifying on behalf of her husband, is not and never has been that she has any interest in the issue to which he is a party. It rests solely upon public policy. To that the statute has no application. Accordingly, though statutes similar to the Act of Congress exist in many of the States, they have not been held to remove the objection to a wife's competency to testify for or against her husband." And though, by the terms of our statute, the wife is allowed to testify for or against her husband, it certainly never was designed to abrogate and annul the wise rule of the common law which renders incompetent both the husband and wife to give evidence as to any communication between them; such as has been testified to in this case by the surviving wife. Upon the same principle that the wife is allowed to give such evidence, she may be compelled to testify to the most secret and confidential communications made to her by her husband.

But, even upon the supposition that the appellee is a competent witness to give the testimony that she has, still, I must dissent from the effect allowed to that testimony.

Here, almost the exclusive evidence upon which the solemn decree of a Court of competent jurisdiction, and

First Nat'l Bank of Washington, *et al. vs.* Eccleston.

the equally solemn deed of the parties, are set aside and nullified, is that given by the appellee herself, as a witness testifying in her own behalf, after the lapse of several years from the date of the transaction, and after the death of her husband, whose conduct is mainly involved. By the decision now made, her testimony is received and given full credence, not only to defame the character and make appear brutal the conduct of her deceased husband and the father of her children, but to overthrow and render nugatory a deed, conceded to have been signed and ac-knowledged by the appellee, with all due forms to render it valid, and which she allowed to stand upon the record unquestioned for six years and a half before any complaint made. Upon the faith of that deed money or credit was obtained by the husband, and there is not the slightest evidence of any agency on the part of those advancing the money or extending the credit, in procuring the deed to be executed by the appellee ; nor is there any evidence whatever of any knowledge on their part, or that they had ground of suspicion even, that the deed was not in all respects proper, and good for what it purported to be on its face. Under such circumstances, if the testimony of the appellee stood without conflict or impeachment, other-wise than by the deed itself, I should regard it as insuffi-cient to warrant the vacation of the deed ; but standing as it does in serious conflict with other disinterested testi-mony in the cause, and being strongly impeached by the circumstances of the case, to say nothing of the motive to exaggerate and give color to her evidence, I cannot but regard it as utterly worthless as a basis upon which to found a decree vacating the deed, as having been obtained by threats and coercion. If solemn deeds can be vacated on testimony such as we have in this case, then there is but little confidence to be placed in any deed executed by a married woman ; and such deeds will only serve as snares and delusions to those dealing upon the faith of them.